IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BOB'S RED MILL NATURAL FOODS,
INC.,

          Plaintiff / Counter Defendant,

                                  3:12-CV-2194-PK

v.                                      OPINION AND
                                          ORDER

EXCEL TRADE, LLC,

          Defendant / Counter Claimant.

PAPAK, Magistrate Judge:

       Plaintiff Bob's Red Mill Natural Foods, Inc. ("BRM"), filed this action against defendant

Excel Trade, LLC ("Excel"), on December 4, 2012, seeking this court's declaration that BRM

does not owe Excel a commission under the parties' written "Commission Agreement" on any

order received by BRM from any of its customers subsequent to the date BRM unilaterally

terminated that agreement.  On January 31, 2013, Excel filed counterclaims against BRM seeking

this court's declaration that, pursuant to the parties' Commission Agreement, BRM owes and will

continue to owe Excel commissions on an ongoing basis in connection with orders received by

Page 1 - OPINION AND ORDER

BRM from any of its customers on whose accounts Excel performed services on BRM's behalf during the effective period of the agreement, for so long as such customers continue to place orders with BRM, and in addition alleging BRM's liability both for breach of the Commission Agreement prior to its termination and for anticipatory breach of the agreement from its termination date forward. This court has subject-matter jurisdiction over the parties' claims pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and the amount in controversy.

Now before the court is BRM's motion (#16) for partial summary judgment, styled as a motion for summary judgment and for partial summary judgment, by and through which BRM seeks summary adjudication of its own declaratory relief claim and of Excel's declaratory relief and anticipatory breach claims. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, the motion is granted in part and denied in part, as discussed below.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient

admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c).

The substantive law governing a claim or defense determines whether a fact is material. *See*

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g.,*

*Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116

S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the

United States must draw all reasonable inferences in favor of the nonmoving party, and may

neither make credibility determinations nor perform any weighing of the evidence. *See, e.g.,*

*Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).

## MATERIAL FACTS[1]

### I.    The Parties

BRM is an Oregon Corporation with its principal place of business in Milwaukie,

Oregon, and is engaged in the business of manufacturing and selling food products. Excel is a

Washington limited liability company with its principal place of business in Seattle, Washington,

and is engaged in the business of providing export management services.

### II.    History of the Parties' Dispute

In the fall of 2004, Robert Agnew, Vice President of sales for BRM, contacted Sally Cox,

Excel's principal and at that time its sole employee, to discuss the possibility of BRM hiring

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of
the evidentiary record in light of the legal standard governing motions for summary judgment
under Federal Civil Procedure Rule 56.

Excel to develop and manage its export business, which at that time totaled approximately $180,000 annually. In the course of their negotiations, Cox expressed concern over the possibility that Excel might develop business on BRM's behalf and then later be "cut out" of any return on that business development, and Agnew indicated that he "understood and acknowledged that [Excel] should be compensated and protected accordingly."[2] The parties ultimately agreed that BRM would retain Excel to provide export management services.

Agnew requested that Cox prepare a broker agreement to memorialize the parties' understanding. Cox did so, and on November 18, 2004, Agnew signed the instrument prepared by Cox, without modification. That agreement (the parties' "Commission Agreement") provides in full as follows:

> We, Bob's Red Mill Natural Food Inc.[,] agree to pay Excel Trade Limited a monthly retainer of $1000, or **5% of the total net sales for each calendar month on sales related to export accounts that are managed by Excel Trade Ltd,** whichever is greater, for each month beginning Nov. l, 2004. This agreement is effective beginning with the last half of October 2004 for the amount of $500, and for the full month of November and thereafter.
>
> The above described retainer is effective for one year and shall be renegotiated after one year.
>
> **Excel Trade shall receive the commission of 5% on an ongoing basis for all orders related to the described accounts as long as they purchase Bob's Red Mill products even if the above described monthly retainer agreement is not renegotiated at the close of one year.** Excel Trade shall provide export management services related to all export accounts for BRM with the exception of Japan which is not covered by this agreement.
>
> Payment of commission shall be made to Excel Trade Limited on a monthly basis.

(Emphasis supplied.) The agreement is signed by Agnew for BRM, but bears no signature nor

---

[2] I consider evidence of the parties' communications in connection with negotiating the Commission Agreement only for limited analytical purposes, as discussed below.

any space for a signature on behalf of Excel.

Over the course of the next approximately 8 years, Excel actively managed BRM's export business, growing BRM's overseas sales from approximately $180,000 annually to approximately $4 million annually by 2012, and growing BRM's overseas markets from three countries to over sixty countries over that time period.

On October 31, 2012, BRM sent Excel a letter stating that "as of November 30, 2012, there w[ould] be a dissolution of the [Commission] [A]greement between [BRM] and Excel. . . ." BRM's letter indicated that BRM would pay Excel "commissions on all orders received [by BRM] prior to December 1, 2012."

On November 1, 2012, counsel for Excel wrote to BRM indicating that Excel interpreted the parties' Commission Agreement of November 2004 as providing that Excel would continue to receive a 5% commission on sales made to accounts that had previously been managed by Excel on BRM's behalf, including after the termination of the agreement, on an ongoing basis, for so long as the BRM clients in question continued to purchase BRM products. The parties failed to resolve their dispute over Excel's purported entitlement to commissions on an ongoing basis following dissolution of the agreement, and this action followed.

## ANALYSIS

### I.   Applicable Law

The Commission Agreement contains no choice of law provision. BRM expressly argues that this court should apply Oregon law in analyzing the parties' dispute, and Excel does not contest BRM's position.

"When a federal court sits in diversity, it must look to the forum state's choice of law

rules to determine the controlling substantive law." *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). In Oregon, prior to embarking on a choice of law analysis, the courts must first determine whether the laws of the states having a connection with the controversy are in conflict on the particular issue or issues in question. *See Lilienthal v. Kaufman*, 239 Or. 1, 5 (1964). "The proponent of the law of another forum has the obligation to identify material differences between the applicable law of Oregon and of the other forum." *Spirit Partners, LP v. Stoel Rives LLP*, 212 Or. App. 295 (2007). Where there is no material conflict in the laws of the different candidate fora, the courts are free to apply the law of either forum. *See, e.g., W. L. May Co. v. Philco-Ford Corp.*, 273 Or. 701, 705 n. 1 (1975); *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 316 (1985). However, where the laws of the fora are in material conflict, the courts must consider the states' relative connection to and interests in the litigation. *See Lilienthal*, 239 Or. at 14. Where the states' relative connection to and interests in the matter are equivalent, the Oregon courts apply Oregon law. *See id.* at 16 (where "[t]he interests of neither jurisdiction are clearly more important than those of the other. . . the law of Oregon should be applied"); *see also, e.g., Straight Grain Builders v. Track N' Trail*, 93 Or. App. 86, 92 (1988) (to same effect).

Here, as noted, no party is a proponent of any law other than that of Oregon. Nevertheless, because there is a colorable argument that Washington law could potentially be applicable, and because (notwithstanding BRM's contrary representation) there is at least one respect in which Washington law of contract interpretation and Oregon law of contract interpretation could be in material conflict, I hereinafter conduct a full analysis of the question whether it is indeed appropriate to apply Oregon law to the parties' dispute.

Page 6 - OPINION AND ORDER

Under Washington law, as under Oregon law, "[a] court's primary task in interpreting a written contract is to determine the intent of the parties." *Barton v. Dep't of Transp.*, 2013 Wash. LEXIS 662 (Wash. Aug. 15, 2013), *citing U.S. Life Credit Ins. Co. v. Williams*, 129 Wn.2d 565, 569 (1996). The Washington courts, however, are authorized to consider extrinsic evidence "in order to assist the court in ascertaining the intent of the parties and in interpreting the contract." *U.S. Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569 (1996), *citing Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990). "Such evidence is admissible regardless of whether or not the contract language is deemed ambiguous," but may not be considered "for the purpose of varying the terms of a written contract." *Id.*, *citing Berg*, 115 Wn.2d at 669. By contrast, under Oregon law, extrinsic evidence is admissible only to the extent the court has determined that the contractual language contains a material ambiguity. *See Yogman v. Parrott*, 325 Or. 358, 364-365 (1997). Because Excel has offered extrinsic evidence tending to establish that the parties discussed the possibility of BRM unilaterally terminating the contract, and that Excel drafted the Commission Agreement specifically to provide that it would continue to receive compensation in the event such unilateral termination occurred, this distinction between Oregon and Washington law could potentially prove material to the resolution of the parties' dispute.

Assuming *arguendo* that the identified conflict of law will prove material to the parties' dispute, I compare the two states' relative connections to and interests in the enforcement of the Commission Agreement and find that neither state's interest in the dispute is clearly more important than the other's. The contract was drafted in Washington and executed in Oregon; Excel's obligations under the contract were performed largely in Washington and BRM's largely in Oregon; Excel is a resident of Washington and BRM of Oregon; payments under he contract

were to be made in Oregon but received in Washington. Moreover, the interests of both states in the outcome of this litigation would be broadly similar, namely a fundamental interest in the enforcement of contracts and in protecting state residents from breach of contract by an out-of-state party. Because neither state's interests clearly outweigh the other's, the Oregon courts would apply Oregon law to the parties' dispute even in the event of a material conflict of law. *See Lilienthal*, 239 Or. at 16.

For the foregoing reasons, I agree with the parties that Oregon law properly governs the analysis the court is called upon to perform.

## II.   Evidentiary Issues

Excel objects to BRM's reliance on the exhibit attached as Exhibit D to the declaration of Robert Agnew. The exhibit is a letter from Excel's counsel to BRM's counsel dated November 29, 2012, and contains clear indicia that it constitutes an offer of settlement of the dispute now before the court. As such, the letter is clearly inadmissible in these proceedings. *See* Fed. R. Evid. 408(a). Excel informally requests that the exhibit accordingly be stricken from the evidentiary record.

Although Excel's objection to BRM's attempted reliance on the offer of settlement is well taken, motions to strike are generally disfavored. Here, I have entirely disregarded the offer of settlement, as well as any argument premised thereon. Excel's informal request is therefore denied as moot.

## III.   BRM's Motion (#16) for Partial Summary Judgment

By and through its motion, BRM seeks summary adjudication of its own declaratory relief claim and of Excel's declaratory relief and anticipatory breach claims. Disposition of each

of these claims requires, and is dependent upon, resolution of the parties' dispute over the

intended duration of BRM's contractual obligation to pay commissions on export sales. In the

alternative, BRM argues that Excel's asserted affirmative defense of unjust enrichment, pursuant

to which Excel takes the position that BRM will be unjustly enriched in the event the court

declares that BRM owes Excel no commissions under the parties' agreement in connection with

orders placed by BRM's customers following termination of the agreement, is inapplicable under

the circumstances, and should be either stricken or disregarded.

### A.    Duration of BRM's Obligation to Pay Commissions on Export Sales

As indicated above, resolution of the parties' dispute hinges largely on a single question

of contract interpretation: whether or not the parties' Commission Agreement provides for Excel

to continue receiving commissions in perpetuity on purchases made by BRM's customers in

connection with whose export accounts Excel provided management services prior to termination

of the agreement. Both parties agree that the phrase "the described accounts" in the clause "Excel

Trade shall receive the commission of 5% on an ongoing basis for all orders related to the

described accounts as long as they purchase Bob's Red Mill products" refers to the "export

accounts that are managed by Excel" referenced in the first paragraph of the agreement. On

BRM's proffered interpretation, the phrase "that are managed" in the latter clause must be

interpreted to mean "that continue to be managed," such that as soon as Excel ceased to manage

the accounts (*i.e.*, immediately upon dissolution of the agreement), BRM's obligation to pay

ended. On Excel's proffered interpretation, the phrase "that are managed" must be interpreted to

mean "that Excel managed during the effective period of the agreement," such that BRM's

obligation to continue paying commissions on such accounts would continue on an ongoing basis

Page 9 - OPINION AND ORDER

until such time as each such customer stopped purchasing BRM's products. That is, BRM urges

an interpretation pursuant to which all obligations under the agreement are terminable at the will

of either party, whereas Excel urges an interpretation pursuant to which BRM's obligation to pay

commissions is perpetual, intended to remain in force for so long as the customers whose

accounts Excel served continue to purchase BRM's products.[3]

In interpreting a contract, the Oregon courts "seek to implement the intent of the parties to

the contract by considering the contract terms in their context." *James v. Clackamas County*, 353

Or. 431, 441 (2013), *citing Anderson v. Jensen Racing, Inc.*, 324 Or. 570, 575-576 (1997). The

Oregon courts apply a three-step analytical process for determining the intent of the parties to a

contract. At the first step, the courts "examine[] the text of the disputed provision, in the context

of the document as a whole." *Yogman*, 325 Or. at 361. If the meaning of the provision is clear at

that stage, the analysis ends without recourse to the second or third steps:

> When considering a written contractual provision, the court's first inquiry is what
> the words of the contract say [rather than] what the parties say about [the
> provision's interpretation]. To determine that, the court looks at the four corners
> of a written contract, and considers the contract as a whole with emphasis on the
> provision or provisions in question. . . . The meaning of disputed text in that
> context is then determined. . . . In making that determination, the court inquires
> whether the provision at issue is ambiguous. Whether terms of a contract are

---

[3] Excel characterizes its interpretation differently, arguing that because it interprets the
contract as providing for termination of BRM's commission obligation upon the occurrence of a
specified contingency, namely when each of BRM's export customers ceases buying BRM's
products, it is not asking the court to find that the agreement provides for a "perpetual"
obligation. In so characterizing its interpretation, Excel imports a requirement (*i.e.*, freedom
from contingency) that the Oregon courts do not recognize. *See, e.g., Paul Gabrilis, Inc. v. Dahl*,
154 Or. App. 388, 394 (1998) (finding that the parties' agreement provided for a perpetual, albeit
contingent, obligation: "the membership agreements contain . . . provisions that. . . lead us to
conclude that the memberships in the country club were *intended to be perpetual, in force so
long as the members continued to pay their dues and to abide by the club's rules*" (emphasis
supplied)).

ambiguous is a question of law. . . .  In the absence of an ambiguity, the court
construes the words of a contract as a matter of law.

*Eagle Industries, Inc. v. Thompson*, 321 Or. 398, 405 (1995) (citations omitted).

In the event of an ambiguity, the courts proceed to the second step of the analytic
framework, at which it considers extrinsic evidence of the parties' intent.  *See Yogman*, 325 Or. at
364.  The application of such extrinsic evidence is generally a question of fact which may not
properly be resolved at summary judgment.  *See Biomass One, L.P. v. S-P Constr.*, 120 Or. App.
194, 200 (1993), *citing, e.g., OSEA v. Rainier School Dist. No. 13*, 311 Or. 188, 194(1991);
*Pierce v. Mt. Hood Meadows Oregon, Ltd.*, 118 Or. App. 450, 454 (1993).  In the event extrinsic
evidence permits the courts to resolve the ambiguity, the analysis ends at the second step.  *See
Yogman*, 325 Or. at 364-365.

In the event the courts cannot resolve the ambiguity on the basis of extrinsic evidence, the
correct interpretation is determined on the basis of "appropriate maxims of construction."  *Id.* at
264.

In determining the meaning of a provision, the Oregon courts consider "the instrument as
a whole rather than its isolated clauses."  *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App.
305, 319 (1985), *citing Sproul v. Gilbert*, 226 Or. 392, 402 (1961).  The Oregon courts do not
interpret a contract in such a manner as to render one of its terms or provisions superfluous.  *See
id.*

As noted above, the parties' dispute boils down to a disagreement as to whether their
agreement provides for a perpetual commission obligation.  Under Oregon law, "perpetual
agreements are disfavored."  *Klamath Off-Project Water Users, Inc. v. PacifiCorp*, 237 Or. App.

434, 441 (2010), *quoting Portland Section of Council of Jewish Women v. Sisters of Charity*, 266

Or. 448, 456 (1973).  "But, where 'clearly provided for' in the language of the agreement,"

perpetual agreements "will be enforced according to their terms."  *Id.*, *quoting Council of Jewish*

*Women*, 266 Or. at 456 (enforcing a perpetual agreement as such where its terms – *viz.*:

"Obligation in perpetuity" – clearly provided for a perpetual duration).  "The question is whether

a given contract has 'clearly provided' for its perpetual duration."  *Id.*

    The *Klamath* court's discussion of Oregon's previous "perpetual agreement" cases is

instructive as to how clearly an agreement must provide for perpetual duration before the Oregon

courts will so construe it:

> In *Andersen v. Waco Scaffold & Equip.*, 259 Ore. 100, 485 P.2d 1091 (1971), the
> Supreme Court addressed the question in a case in which the parties entered into
> an equipment rental contract for a three-year term, renewable upon mutual
> agreement.  When the three-year term expired, the parties did not agree to renew
> it; they simply continued on the same terms.  Several months later, a dispute arose
> about the enforceability of the agreement.  One party contended that the contract
> remained in effect because both parties had continued to abide by its terms even
> after its expiration.  The Supreme Court rejected the argument, explaining that
>
> > "th[at] fact does not of itself establish a renewal of the contract.  The
> > contract itself provided for renewal only by mutual agreement; there is no
> > evidence that the parties ever agreed to extend their contract for another
> > non-cancelable period.  At most, the evidence indicates an informal
> > continuation under the terms of the contract; *since no new agreement with
> > a specific duration was reached, the relationship between the parties was
> > terminable at the will of either.*"
>
> *Id.* at 105 (citations omitted; emphasis added).
>
> In *Lund v. Arbonne International, Inc.*, 132 Ore. App. 87, 887 P.2d 817 (1994),
> we had occasion to apply *Andersen* in a dispute concerning a consulting contract
> between a beauty and skin care company and its registered consultant.  The
> contract said nothing about a particular term.  When a dispute arose between the
> company and its consultant, the company "deregistered" the consultant, who
> promptly sued for, among other things, breach of contract.  The trial court

dismissed the claim on summary judgment, and we affirmed. Notwithstanding
the consultant's contentions that there were issues of fact about whether the parties
intended the agreement to be terminable at will, we concluded the claim could not
be maintained as a matter of law. Citing *Andersen*, we explained:

> "[T]he rule in Oregon is that a contract for an indefinite period may be
> terminated at will when reasonable notice is given. Here, the only
> agreement * * * does not set out a definite period for the relationship. We
> conclude that the agreement established an 'at will' relationship."

*Lund*, 132 Ore. App at 90-91 (citations and footnote omitted).

The issue arose again in *Paul Gabrilis, Inc. v. Dahl*, 154 Ore. App. 388, 394, 961
P.2d 865, *rev den*, 327 Ore. 553, 971 P.2d 409 (1998), a case in which a country
club unilaterally terminated several memberships. The country club argued that,
because the membership agreement said nothing about its duration, membership
was terminable at will. We rejected the argument. We explained that, "[i]f there
is nothing in the nature or language of a contract to indicate that the contract is
perpetual, courts will interpret the contract to be terminable at will * * *." *Id.* at
394. **The important consideration, we explained, is the wording of the
contract.** Citing *Coun. Jewish Wom.*, we added that, "where provided for,
perpetual agreements will be enforced according to their terms." *Paul Gabrilis,
Inc.*, 154 Ore. App at 394. We concluded that several provisions of the
membership agreement--in particular, the transferability of memberships and
provisions suggesting that memberships could be terminated only for cause--were
inconsistent with the notion that the memberships were terminable at will. *Id.* at
395.

*Klamath*, 237 Or. App. at 441-443 (bolded emphasis supplied; italicized emphasis and

modifications original). The last case discussed by the *Klamath* court, *Paul Gabrilis, Inc. v.

Dahl*, 154 Or. App. 388 (1998), is particularly instructive. In that case, as indicated by the

*Klamath* court, at issue was the interpretation of a country club membership agreement, in

particular the question whether membership could be terminated at the will of the country club.

The court offered three independent grounds for concluding that the agreement was intended to

be perpetual, notwithstanding the fact that the agreement did not expressly (or otherwise facially)

provide for perpetual duration. *See Paul Gabrilis*, 154 Or. App. at 394-395. First, the court

determined that the agreement provided for no mechanism for refund of a club member's one-time-only "initiation fee," and the absence of any such mechanism suggested to the court that "the parties intended the fee to secure more than a mere license that is revocable at any time." *Id.* at 395. Second, the court found that the fact that the memberships were expressly transferable under the agreement was not consistent with the notion that membership was also revocable. *See id.* Third, and finally, the court found that the agreements provided non-exhaustive grounds for suspension or termination of memberships, and reasoned that "[a]lthough the inclusion of grounds for termination in an agreement is not always a sign that the agreement can be terminated only for cause, the inclusion of such a provision strongly suggests that it is." *Id.*

BRM takes the position that the Oregon courts impose two additional restrictions on the analysis of potentially perpetual agreements. First, BRM asserts that the Oregon courts will not find an agreement to be perpetual if that finding would require any "second thought" as to the meaning of the agreement's material provisions. In support of this proposition, BRM cites *Bancard Servs. v. E\*Trade Access, Inc.*, 292 F. Supp. 2d 1235, 1250 (D. Or. 2002), a decision of the District of Oregon. I disagree with BRM's interpretation of *Bancard Servs.*, and reject BRM's assertion that the Oregon courts recognize the "no second thought" restriction.

In *Bancard Servs.*, Judge Hubel was called upon to interpret a renewal provision of a lease agreement providing for a five-year term and for renewal at the discretion of the lessee for additional terms of five years. *See Bancard Servs.*, 292 F. Supp. 2d at 1245-1246. Both sets of parties before Judge Hubel cited and relied upon a 1904 decision of the Washington Supreme Court, namely *Tischner v. Rutledge*, 35 Wash. 285 (1904). *See id.* at 1249. Judge Hubel quoted the *Tischner* court's reasoning as follows:

> Moreover, the phrase used which is thought to create the perpetual right is of itself
> likely to conceal its real meaning. When we speak of a thing as continuing from
> year to year, it is only on second thought that we conclude it means forever. This
> we do not think is the direct and unequivocal language necessary to create a lease
> of the character contended for.

*Id., quoting Tischner*, 35 Wash. at 289. In considering the renewal provision before him, Judge

Hubel relied in part on the *Tischner* court's "only on second thought" language to find that the

provision was not clearly intended to provide for perpetual duration as opposed to providing for

one or more finite terms. *See id.* at 1250. Judge Hubel did not purport to apply the language

outside the limited context of interpreting lease renewal provisions, and did not suggest that the

Oregon courts had ever adopted a "no second thoughts" requirement in connection with the

analysis of agreements of potentially perpetual duration. *See id., passim.* Indeed, I am aware of

no decision of the Oregon courts so suggesting, and BRM cites to none. Moreover, the *Paul

Gabrilis* decision necessarily stands for the contrary proposition, namely that in analyzing the

perpetuity question the Oregon courts will consider the implications of contractual provisions not

directly or expressly related to duration, and will find that perpetual duration is intended if the

alternative interpretation would lead to potential inconsistency with those provisions or their

implications, even at an attenuated level.

Second, BRM asserts that the Oregon courts will not find an agreement to be perpetual on

the basis of extrinsic evidence alone, but rather require that an agreement unambiguously provide

for perpetual duration on its face if it is to be so construed. In support of this proposition, BRM

points only to *Bancard Servs.* Although I agree with BRM that the Oregon courts disfavor

perpetual agreements, I have not identified any Oregon case suggesting that such agreements are

so disfavored as to be outside the three-step analytical process described in *Yogman, supra.*

Page 15 - OPINION AND ORDER

Moreover, as noted above, *Bancard Servs.* provides no support for BRM's assertion, and *Paul Gabrilis* significantly undermines BRM's reasoning.

Under *Yogman*, extrinsic evidence is never sufficient to create a contractual obligation where the language of the agreement itself provides no support for that obligation. Only where the language of the agreement is ambiguous between two or more competing interpretations can extrinsic evidence be relied upon to resolve the ambiguity in favor of one of the interpretations supported by the contract language. No principle of Oregon law suggests that where contract language can reasonably be interpreted as intended to provide for a perpetual obligation, but is also subject to a reasonable alternative interpretation, extrinsic evidence is inadmissible to resolve the ambiguity other than in favor of the latter, alternative interpretation. In consequence, I decline to adopt BRM's asserted rule.

In similar vein, BRM further asserts that in the event of any ambiguity in the provisions of the parties' Commission Agreement, such ambiguity must necessarily be resolved against the interests of Excel, the drafter of the agreement. In support, BRM cites *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 470-471 (1992). However, the rule discussed in *Hoffman* was applied by that court solely in the context of agreements drafted by insurance companies, and is impliedly applicable only in the broader context of adhesion contracts generally. No Oregon court has ever applied any such rule in connection with a contract negotiated at arm's length between parties of roughly equal bargaining power. I therefore decline to adopt this asserted rule, as well.

With the foredescribed analytical framework in mind, I now turn to analysis of the parties' agreement. At the first stage of the three-step analytical process, I read the disputed provision in

Page 16 - OPINION AND ORDER

context in an effort to determine whether it is subject to a clear and unambiguous interpretation.

The agreement provides that for a period of one year BRM would pay Excel either a $1,000 monthly "retainer" or "5% of the total net sales for each calendar month on sales related to export accounts that are managed by Excel Trade Ltd, whichever is greater" (and that Excel was obliged to "provide export management services related to all export accounts for BRM with the exception of Japan"). According to the plain language of the agreement, BRM's obligation to pay monthly installments of $1,000 for one year would exist even in the event that BRM had no export accounts other than Japan, and even in the event that the contemplated commission never exceeded $1,000 per month. The agreement provides that the provision memorializing BRM's retainer obligation was to be renegotiated after one year.

By and through the disputed provision, the parties further agreed that BRM's obligation to pay commissions "for all orders related to the described accounts" would survive the parties' failure to renegotiate "on an ongoing basis" for "as long as [BRM's customers whose accounts Excel managed] purchase [BRM] products," whereas, impliedly, the monthly retainer obligation would *not* so survive the failure to renegotiate.

BRM urges the court to construe the phrase "the described accounts" as referring to those export accounts which Excel continued to manage following the failure to renegotiate the retainer provision. If the court were to adopt this interpretation, the additional phrase "as long as they purchase [BRM] products" would necessarily become superfluous. In light of the prohibition against adopting an interpretation which would render contract language superfluous, *see Deerfield Commodities*, 72 Or. App. at 319, BRM's proffered interpretation is disfavored, and should not be adopted in the absence of admissible evidence that the parties intended the

Page 17 - OPINION AND ORDER

agreement to be so interpreted, or that the provision is subject to no other reasonable
interpretation.

For its part, Excel urges the court to construe "the described accounts" as referring to
those export accounts which Excel managed during the effective period of the parties' agreement,
without regard to whether it continued to manage those accounts following termination of the
agreement. On this interpretation, none of the contract language would be rendered superfluous,
and the interpretation of the language "shall receive the commission of 5% on an ongoing basis
for all orders related to the described accounts as long as they purchase Bob's Red Mill products"
as providing for a perpetual obligation to pay commissions on such accounts subject to the
contingency that the customers in question continue purchasing BRM products is reasonable and
supported by the plain language itself. The language "even if the above described monthly
retainer agreement is not renegotiated at the close of one year," which modifies the foregoing
language, is subject to the coherent, reasonable interpretation that whereas the minimum retainer
obligation would not survive failure to renegotiate, the commission obligation would so survive.

Excel's proffered interpretation is reasonable in light of the plain language of the
agreement, and is the only interpretation offered by the parties that would not fall afoul of the
principle that contracts must not to be interpreted so as to render their provisions superfluous. I
therefore find that the parties' agreement is not ambiguous, but rather can only reasonably be
interpreted under Oregon's analytical framework for contract interpretation as providing for a
perpetual obligation to continue paying commissions on sales to BRM's export customers on
whose accounts Excel provided management services during the effective period of the
Commission Agreement. I make no finding as to whether it was prudent for the parties to enter

into an agreement so providing, or as to whether such an interpretation will result in a desirable resolution of the parties' dispute, but rather find only that, under Oregon's law of contract interpretation, the Commission Agreement cannot properly be interpreted otherwise.

Moreover, the same result would obtain were I to find that the disputed provision was ambiguous between the parties' competing interpretations. On the *arguendo* assumption that the meaning of "on an ongoing basis . . . as long as [the customers at issue] purchase Bob's Red Mill products" cannot be resolved by contextual analysis, I would next consider extrinsic evidence of the parties' intent in drafting and executing their agreement. *See Yogman*, 325 Or. at 364. The only material evidence offered by either party on this point is Cox' testimony that over the course of her negotiations with Agnew, she expressed concern over the possibility that Excel might develop business on BRM's behalf and then later be "cut out" of any return on that business development, and that Agnew indicated in response that he "understood and acknowledged that [Excel] should be compensated and protected accordingly."[4] In the absence of any contrary evidence of record, Cox' testimony compels resolution of the putative ambiguity in Excel's favor.

BRM further argues that even if Oregon law compels adoption of Excel's proffered interpretation, this court should reject it on the theory that calculation of Excel's asserted damages would be so difficult and so speculative as to constitute a compelling ground for finding the Commission Agreement terminable in its entirety at the will of either party. I am aware of no case law supporting BRM's position, and find no grounds for so concluding.

------

[4] I consider this extrinsic evidence only in this context, and only for the limited purpose of analyzing the parties' dispute on the *arguendo* assumption that the parties' Commission Agreement is ambiguous as to the duration of BRM's obligation to pay commissions on its non-Japanese export sales.

Page 19 - OPINION AND ORDER

For the foregoing reasons, to the extent BRM seeks summary adjudication of its own claim for declaratory relief, Excel's claim for declaratory relief, and Excel's claim of anticipatory breach, its motion is denied.

### B.      Excel's Affirmative Defense of Unjust Enrichment

Under Oregon law, unjust enrichment is a quasi-contractual doctrine pursuant to which, in appropriate situations, a person may be entitled to the fair value of services provided to another in the absence of a formal agreement for such compensation. *See, e.g.*, *Prestige Homes Real Estate Co. v. Hanson*, 151 Or. App. 756, 761 (1997), *quoting Kashmir v. Patterson*, 43 Or. App. 45, 47-48 (1979). It is clear that the doctrine is applicable only where no enforceable contract for provision of the services exists between the party providing and the party receiving them. *See id.* BRM argues that, here, Excel may not rely on its asserted affirmative defense of unjust enrichment, because the parties' Commission Agreement covers BRM's obligation to compensate Excel for its provision of export management services.

BRM is correct. It is both clear and undisputed that the Commission Agreement covers all of the services Excel provided to BRM. In consequence, even in the event that Excel failed to recover from BRM on either of its counterclaims for breach of contract, its unjust enrichment

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 20 - OPINION AND ORDER

defense would not lie. BRM's motion is therefore granted to the extent it addresses Excel's

asserted unjust enrichment defense, and that defense is stricken from Excel's pleading.

## CONCLUSION

For the reasons set forth above, BRM's motion (#16) for partial summary judgment is

granted as to Excel's affirmative defense of unjust enrichment only, and is otherwise denied.


Dated this 30th day of October, 2013.

Honorable Paul Papak
United States Magistrate Judge